# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOY G. WARD,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:18cv00002 |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Joy G. Ward, ("Ward"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & 2019 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019. He is substituted for Nancy A. Berryhill as the defendant in this case.

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ward protectively filed her application for DIB on August 30, 2013, alleging disability as of June 9, 2013, based on fibromyalgia; diabetes; arthritis; vitamin D deficiency; back pain; hip pain; chronic obstructive pulmonary disease, ("COPD"); sleep apnea; pins and a plate in the right ankle with arthritis; and depression. (Record, ("R."), at 20, 202, 222.) The claim was denied initially and upon reconsideration. (R. at 115-17, 124-27.) Ward then requested a hearing before an administrative law judge, ("ALJ"). (R. at 129-30.) The ALJ held a hearing on August 30, 2016, at which Ward was represented by counsel. (R. at 40-73.)

By decision dated November 23, 2016, the ALJ denied Ward's claim. (R. at 20-33.) The ALJ found that Ward met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018.[2] (R. at 22.) The ALJ found that Ward had not engaged in substantial gainful activity since June 9, 2013, the alleged onset date. (R. at 22.) The ALJ found that the medical evidence established that Ward had severe impairments, namely obstructive sleep apnea; asthma; obesity; myalgia; diabetes mellitus; lumbar spine degenerative disc disease; depressive disorder; and anxiety disorder, recently severe, but she found that Ward did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-25.) The ALJ found that Ward had the residual functional

---

[2] Therefore, Ward must show that she was disabled between June 9, 2013, the alleged onset date, and November 23, 2016, the date of the ALJ's decision, in order to be eligible for DIB benefits.

capacity to perform simple, repetitive, unskilled sedentary work[3] that did not require her to stand and walk for more than two hours and sit for more than six hours in an eight-hour workday; that did not require more than occasional pushing and pulling with the lower extremities; that did not require working around hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds, working on vibrating surfaces or crawling; that did not require more than occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching; that allowed her to avoid even moderate exposure to temperature extremes, excess humidity and pulmonary irritants; that did not require driving; and that did not require more than occasional interaction with the general public. (R. at 25-26.) The ALJ found that Ward was unable to perform her past relevant work. (R. at 31.) Based on Ward's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Ward could perform, including jobs as an assembler, a weight tester and an addressing clerk. (R. at 31-32.) Thus, the ALJ concluded that Ward was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 32-33.) *See* 20 C.F.R. § 404.1520(g) (2018).

After the ALJ issued her decision, Ward pursued her administrative appeals, (R. at 196-99), but the Appeals Council denied her request for review. (R. at 1-5.) Ward then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Ward's motion for summary judgment

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2018).

filed August 2, 2018, and the Commissioner's motion for summary judgment filed August 31, 2018.

## II. Facts[4]

Ward was born in 1967, (R. at 202), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). Ward has a high school education with licensed practical nursing, ("LPN"), training. (R. at 43, 45.) She has past work experience as an LPN. (R. at 43, 47.) She stated that she stopped working in June 2013 due to severe back pain. (R. at 45-46.) Ward testified that she remained off of work on medical leave until she was terminated. (R. at 46.) She stated that was receiving pain medication for her back, but had tried physical therapy and injections, neither of which worked. (R. at 49.) Ward testified that her pain was most intense in her lower back and radiated into her legs, the right worse than the left. (R. at 59.) She rated her pain a nine on a 10-point scale. (R. at 59-60.) Ward testified that she also suffered from insulin-dependent diabetes for at least six years, resulting in peripheral neuropathy in all her extremities, which caused her to sometimes drop objects, and have difficulty grasping and using her hands for repetitive actions. (R. 60-61.) She testified that she frequently had to change positions to maintain her pain at a bearable level, noting that she had to lie down with her legs elevated at least three times daily for about an hour. (R. at 61.) She testified that she took hydrocodone four times daily for pain. (R. at 62.)

Ward testified that she could walk about 15 feet before having to stop, she could stand for only about five minutes due to pain, she could sit for less than 30

---

[4] In her brief, Ward limits the facts to those pertaining to her back impairment. Therefore, the court also will limit the facts contained herein to those relevant to Ward's back impairment.

minutes due to leg numbness, and she could lift items weighing up to five pounds. (R. at 50-51, 59.) Ward stated that she had to sit on a stool to wash dishes. (R. at 50.) She testified that she could not stoop, squat, bend, kneel, climb or crawl due to her pain and her weight. (R. at 62-63.) Ward testified that she was 5'5" tall and weighed 416 pounds. (R. at 47.)

Ward testified that she had two children, ages 14 and 12. (R. at 51.) She testified that her daily activities had lessened since she completed a November 2013 Function Report, specifically noting that she had not been to church in months due to a fear of falling from back pain and leg numbness, shortness of breath and difficulty getting herself ready. (R. at 51, 58.) Ward also stated that she needed someone to go with her to grocery shop because she could not retrieve items off of the shelves, and she had to use a ride along cart. (R. at 51-52.) She stated that she drove when required, about twice weekly. (R. at 52, 58.) Ward testified that she could prepare frozen, quick and easy to prepare meals, such as microwave meals. (R. at 58.) She stated that her ability to perform chores also had decreased since November 2013, noting that she required help from her husband and children because her health had worsened. (R. at 52.) She testified that she had difficulty with personal care, including bathing. (R. at 58-59.)

Ward also testified that she had difficulty staying on task, remaining focused and maintaining attention and concentration. (R. at 63.) She stated that Dr. Sheppard, who she saw for both physical and mental ailments, had prescribed Cymbalta for her mental impairments, which she had taken for about 14 years, but she had not undergone any type of counseling. (R. at 54-55, 62-63.) Ward also testified that she had not had any psychiatric hospitalizations. (R. at 55.) Ward testified that Dr. Sheppard also had referred her to East Tennessee Brain and Spine. (R. at 56.)

Asheley Wells, a vocational expert, also was present and testified at Ward's hearing. (R. at 63-71.) Wells classified Ward's past work as an LPN as medium[5] and skilled, although Ward testified that she performed it at the heavy[6] exertional level. (R. at 64-65.) Wells was asked to consider a hypothetical individual of Ward's age, education and work history, who could perform sedentary work that did not require her to be exposed to hazardous machinery, work at unprotected heights, climb ladders, ropes or scaffolds, work on vibrating surfaces or crawl; that did not require more than occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching; that would not require even moderate exposure to temperature extremes, excess humidity and pulmonary irritants; and that would not require driving as part of the job. (R. at 65.) Wells testified that such an individual could not perform Ward's past work, either as she actually performed it or as it customarily is performed in the national economy. (R. at 65.) However, Wells testified that there were jobs existing in significant numbers in the national economy that such an individual could perform, including those of an assembler, a weight tester and an addressing clerk. (R. at 65-66.) Wells next testified that the same individual, but who also could perform repetitive, unskilled work, and who could have no more than occasional interaction with the general public, could not perform Ward's past relevant work, but could perform the jobs previously cited. (R. at 66-67.) Wells testified that an individual who had to either sit down or lie down to elevate her legs three times daily for an hour each time, could perform neither Ward's past work nor any other work existing in significant numbers in the national economy. (R. at 67-68.)

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time and frequently lifting and carrying items weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2018).

[6] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, she also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2018).

Wells also testified that the following restrictions, independently, would preclude the performance of competitive employment: (1) being off task greater than 10 percent of the workday; (2) missing two days or more of work monthly; (3) having a marked limitation in the ability to behave in an emotionally stable manner; (4) having an ability to stand and walk for two hours or less during a workday and sit for two hours or less during a workday; (5) having an inability to climb, stoop, kneel, crouch and crawl; and (6) being able to use the hands for simple, repetitive tasks less than occasionally. (R. at 69-71.)

In rendering her decision, the ALJ reviewed records from Johnson City Medical Center; Norton Community Hospital; Holston Medical Group; Pulmonary Associates of Kingsport; MSMG Neurology; Appalachian Healthcare Associates, P.C.; East Tennessee Brain & Spine Center; Kristie J. Nies, Ph.D., a licensed clinical psychologist; Dr. R. David Sheppard, D.O.; Franklin Woods Community Hospital; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. William J. Wallace, M.D.; Blue Ridge Neuroscience; Dr. Jack Hutcheson, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. James Darden, M.D., a state agency physician; and Linda Dougherty, Ph.D., a state agency psychologist.

Ward treated with Dr. Sheppard from March 28 through October 2, 2013. (R. at 405-20.) Over this time, she was diagnosed with obesity, type II diabetes mellitus, lumbar disc degeneration, lumbago, osteoarthritis and lumbar strain, among other things. (R. at 405-20.) In May, June, August and October 2013, Ward had tenderness to palpation of the lumbosacral spine. (R. at 409, 412, 415, 419.) In May 2013, Dr. Sheppard referred Ward to a neurologist. (R. at 418.) In June 2013, she complained of lumbar back pain radiating into the right hip, which began after cleaning her house. (R. at 413.) She stated she had been attending physical therapy,

but it had not been helping. (R. at 413.) In August 2013, Ward reported that she had seen a neurosurgeon, been referred to pain management and had received a nerve block, but she continued to have low back pain. (R. at 411.) At that time, she stated she had been off of work for more than two months. (R. at 411.) In October 2013, Ward reported an inability to sit or stand for prolonged periods due to pain. (R. at 408.)

Except as specified, Ward's physical examinations were normal over this time, including normal neurological findings. (R. at 405-06, 409-10, 411-12, 414-17.) She was consistently alert, oriented and in no acute distress with a euthymic mood. (R. at 405-06, 409-10, 412, 414-17.) In October 2013, she denied anxiety and depression. (R. at 408.) From March 2013 to October 2013, Ward was prescribed various medications, including Lortab and Flexeril, and she was referred to physical therapy. (R. at 411, 415, 420.) Ward began this course of physical therapy for lumbar sprain at Mountain States Rehabilitation on May 22, 2013. (R. at 384-91.) However, she completed only four of 18 scheduled appointments. (R. at 382.) Limited progress was noted due to lack of compliance. (R. at 382.)

X-rays of the lumbar spine, dated May 17, 2013, showed mild degenerative changes at multiple lower thoracic levels. (R. at 527.) A carotid duplex ultrasound, dated June 14, 2013, showed no hemodynamically significant stenosis. (R. at 523.)

Ward saw Dr. Emily Shields, M.D., a neurologist, at MSMG Neurology, on August 6, 2013, for complaints of right-sided facial numbness. (R. at 399-401.) Ward denied any other focal weakness or numbness, problems with speech or ambulating. (R. at 399.) Ward reported generalized fatigue, leg swelling and leg pain when walking. (R. at 399-400.) She also reported low back pain, sciatica,

stiffness and foot pain, depression, irritability and memory loss. (R. at 400.) Ward reported that she was having a back injection performed the next day. (R. at 399.) At that time, Ward weighed 372 pounds. (R. at 400.) On physical examination, Ward was oriented and in no acute distress, she had a normal range of motion of the neck and spine with no tenderness, her peripheral pulses were equal and symmetric, and extremities were normal with no edema. (R. at 400.) Ward's recent and remote memory, attention span, concentration and language were intact, and she had normal spontaneous speech and fund of vocabulary. (R. at 400.) Neurologic examination was normal, Ward had normal and equal muscle strength, bulk and tone in the upper and lower extremities, and sensation was normal throughout. (R. at 400.) She had a mildly wide-based gait due to body habitus, but she was able to walk on her toes with some difficulty. (R. at 401.) Ward was unable to obtain muscle stretch reflexes, again, likely due to body habitus. (R. at 401.) Dr. Shields recommended that Ward practice daily aspirin therapy and discussed lifestyle modifications. (R. at 401.)

Ward was treated at East Tennessee Brain & Spine Center from July 29 through October 29, 2013. (R. at 538-53.) In July 2013, Ward complained of increased back, right buttock and leg pain, worse with walking and standing. (R. at 551.) She reported that physical therapy had not improved her condition and that she had not undergone any injections. (R. at 551.) A physical examination revealed some tenderness over the axial spine, but no sacroiliac, ("SI"), joint tenderness. (R. at 552.) Ward had good strength proximally and distally in both legs, and there was no focal weakness. (R. at 552.) Dorsiflexion and plantar flexion were full bilaterally. (R. at 552.) She had some edema in both ankles, but straight leg raise testing and Patrick's maneuver[7] were negative. (R. at 552.) Sensory examination

_____

[7] Patrick's maneuver is performed with the patient supine, the thigh and knee flexed, and the external malleolus is placed over the patella of the opposite knee. If pain is produced when

was unremarkable, patellar reflexes were 2 and symmetrical, and Achilles reflexes were 1 and symmetrical. (R. at 552.) Ward's gait was nonantalgic, but her range of motion was somewhat limited in terms of flexion and extension due to pain. (R. at 552.) Steve McLaughlin, a physician assistant, reviewed an MRI, which showed facet arthropathy at the L1-L2, L2-L3 and L3-L4 levels of the spine. (R. at 552.) There also was some "very, very mild" central stenosis at these levels, but no disc herniation or any severe central stenosis. (R. at 552.) McLaughlin diagnosed mechanical low back pain from mild degenerative disc disease and right leg pain. (R. at 553.) He reported no structural lesion on the MRI to explain Ward's right lower extremity pain, which appeared radicular in nature. (R. at 553.) McLaughlin noted that Dr. David Wiles, M.D., also saw Ward, and he referred her for some facet blocks with chronic pain management. (R. at 553.)

From August to October 2013, Ward underwent three different types of pain injections. In August 2013, Dr. Ihab Labatia, M.D., performed a lumbar medial branch block for diagnoses of lumbosacral spondylosis without myelopathy and low back pain. (R. at 549-50.) This procedure was to be repeated in one to two weeks, but Ward reported that it did not help much. (R. at 547, 550.) Thus, Dr. Labatia decided to administer an SI joint injection for a diagnosis of sacroiliitis, not elsewhere classified. (R. at 548.) Again, this procedure was to be repeated in one to two weeks, but, again, when Ward returned, she stated that the SI injection did not give her significant pain relief. (R. at 544, 548.) A physical examination revealed exquisite tenderness over the right greater trochanter. (R. at 545.) Wesley Perry, a physician assistant, diagnosed lumbosacral spondylosis without myelopathy, low back pain, lumbar degenerative disc disease, sacroiliitis, not elsewhere classified, pain in a limb and trochanteric bursitis. (R. at 545.) He

---

the knee is depressed, arthritis of the hip is indicated. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), at 1688 (27th ed. 1988).

ordered a trochanteric injection with Dr. Labatia, which was performed on October 10, 2013. (R. at 542-43, 545.) At a follow-up appointment on October 29, 2013, Ward stated that the injection did not help very much, noting that when she bent forward, she had pain that traveled from her back and wrapped around into the lateral aspect of the hip and thigh, but never below the knee. (R. at 539.) On physical examination, Ward was in no acute distress, and she had minimal tenderness over the axial spine. (R. at 540.) She had tenderness to deep palpation over the right greater trochanter, but straight leg raising was negative. (R. at 540.) Motor strength was full, and she had a nonantalgic gait. (R. at 539.) Ward's diagnoses remained the same, and McLaughlin noted that he continued to believe she had an element of trochanteric bursitis. (R. at 540.) Ward was not interested in any further injections. (R. at 540.) McLaughlin stated Ward needed to work on weight loss, staying active and avoiding sugary foods. (R. at 540.) She was released to be seen on an as-needed basis. (R. at 540.)

Ward continued to receive treatment from Dr. Sheppard from November 5, 2013, through July 25, 2014. (R. at 597-611.) Over this time, she continued to complain of back pain that radiated into her left leg. (R. at 597, 604.) She reported undergoing multiple back injections. (R. at 608.) Ward stated that bending over caused immediate pain and that she had to sit frequently to alleviate her back pain. (R. at 604, 608.) In February 2014, Dr. Sheppard discussed filing for disability due to Ward's continued chronic pain, and in April 2014, Ward advised Dr. Sheppard that she had applied for disability benefits. (R. at 601, 607.) In July 2014, Dr. Sheppard noted that Ward was being evaluated for a spinal stimulator and that she had been terminated from her job at that time. (R. at 597.) In November 2013, February 2014 and July 2014, physical examinations revealed tenderness to palpation of the lumbosacral spine. (R. at 598, 606, 610.) In July 2014, Ward also exhibited lumbosacral spasms. (R. at 598.) Dr. Sheppard continued to diagnose

lumbar disc degeneration, among other things, and he prescribed medications. (R. at 599, 603, 606.) Over this time, Ward was alert and oriented with a euthymic mood. (R. at 598-99, 602-03, 605-06, 609-10.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), for Ward on January 30, 2014, in connection with her initial disability determination, finding that she had no restrictions on her activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated extended-duration decompensation episodes. (R. at 95-96.) The same day, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical assessment of Ward in connection with her initial disability determination. (R. at 97-99.) Dr. Hutcheson found that Ward could perform sedentary work that required standing and/or walking for a total of no more than three hours in an eight-hour workday and that required sitting for a total of no more than six hours in an eight-hour workday. (R. at 97.) He further found that Ward was limited in her ability to push/pull with her lower extremities and that she could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 97-98.) He found that Ward should avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, odors, dusts, gases and poor ventilation and she should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 98-99.)

Ward returned to East Tennessee Brain & Spine Center on March 27, 2014, reporting that her pain now was radiating down her leg to her foot and that standing or walking for any length of time exacerbated her pain. (R. at 564-66.) Physical examination showed full strength, 2+ reflexes in the patellae and Achilles, and Ward was neurologically stable. (R. at 565.) Her diagnoses remained

unchanged. (R. at 565.) Jason Walls, a physician assistant, scheduled a lumbar epidural steroid injection. (R. at 565.) He noted that Ward's history was consistent with neurogenic claudication.[8] (R. at 565.) He believed that standing caused her weight to compress the nerves, likely resulting in the radicular pain. (R. at 565.) On April 23, 2014, Dr. Labatia administered a lumbar epidural steroid injection for Ward's lumbar radiculopathy, lumbar stenosis and lumbar degenerative disc disease. (R. at 561-62.) Ward tolerated the procedure well without complication. (R. at 562.)

On August 27, 2014, Kristie J. Nies, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Ward on her counsel's referral in order to document the psychological components of Ward's pain syndrome and to assist in determining factors that may impact prognosis for invasive procedures. (R. at 699-702.) Nies noted that a lumbar steroid injection had not provided pain relief for Ward, and a spinal cord stimulator was being considered. (R. at 699.) Ward's motor activity was within normal limits, she did not appear to have difficulty understanding or retaining directions, and repetition was not required. (R. at 699.) Conversational speech was within normal limits, Ward's affect was appropriate, and her mood was neutral. (R. at 699.) She was pleasant and cooperative throughout, and she did not demonstrate pain behavior or complain of fatigue. (R. at 699.) Her chief complaint was intermittent back and right hip/leg pain that developed gradually, for which she had undergone multiple procedures with no relief. (R. at 699.) She stated that moving/bending and standing in one position exacerbated her pain. (R. at 700.) Ward's goal was to be more active with less pain, noting that she would like to be able to walk at least 30 minutes with pain no

---

[8] Neurogenic claudication, also known as pseudoclaudication, is leg pain, heaviness and/or weakness with walking caused by compression of the spinal nerves in the lumbar spine. *See* https://www.columbiaspine.org/condition/neurogenic-claudication (last visited Aug. 22, 2019).

greater than a five on a 10-point scale. (R. at 699.) She rated her current abilities as follows: sit for two to three hours; stand for 30 minutes and walk for five to 10 minutes. (R. at 699.)

Ward reported needing assistance at times with dressing and that she had forgotten to pay bills on a couple of occasions. (R. at 700.) She stated that driving sometimes increased pain and numbness in her right leg. (R. at 700.) Ward advised Nies that a typical day included getting her children off to school and fixing meals, but she had to sit and rest frequently. (R. at 700.) She reported reading, watching television and enjoying computer games. (R. at 700.) Ward reported that she managed her medications independently. (R. at 700.) Ward acknowledged situational stress related to her family, finances and her medical condition. (R. at 700.) Ward reported one episode of depression, but she described her mood as "pretty normal" and "upbeat." (R. at 700.) She stated that she was "snappish" at times. (R. at 700.) She acknowledged an intermittent sad mood, disturbance of sleep onset and maintenance, weight gain, some feelings of worthlessness and guilt, fatigue, restlessness, irritability and some muscle tension, symptoms which had been present for years. (R. at 700.) Ward denied mania, psychotic features, suicidal/homicidal ideation, panic attacks and obsessions/compulsions. (R. at 700.)

Nies administered two performance validity tests, both of which yielded normal results. (R. at 700.) Ward was given a self-report mood inventory, on which she endorsed items consistent with a borderline degree of depression and a moderate degree of anxiety. (R. at 700.) According to Nies, Ward was not indicating psychiatric distress at that time. (R. at 701.) However, her ability to adhere to a self-care regimen or prescribed lifestyle may become problematic. (R. at 701.) Nies rated Ward's major surgical outcome risk factors, concluding that her overall prognosis for invasive procedures was good, that post-operative

psychological treatment was recommended and that the risk for overuse of opioid medication was low. (R. at 701.)

Nies diagnosed Ward with a pain disorder with both psychological factors and general medical conditions, including lumbosacral spondylosis without myelopathy; lumbar stenosis; sacroiliitis, not elsewhere classified; lumbar radiculopathy; and lumbar degenerative disc disease; and an adjustment disorder with mixed anxiety and depressed mood. (R. at 701.) She concluded that Ward was likely experiencing some degree of psychiatric distress, but she appeared to have a basic understanding of the mechanics of the stimulator and reasonable expectations regarding its efficacy. (R. at 702.) She appeared motivated to improve. (R. at 702.) Nies concluded that Ward's overall surgical prognosis was good, but that psychosocial interventions might improve her chances of lasting benefit. (R. at 702.)

Linda Dougherty, Ph.D., completed another PRTF in connection with the reconsideration of Ward's disability claim on September 10, 2014. (R. at 107.) She found that the evidence of record did not establish any mental medically determinable impairment. (R. at 107.) On September 11, 2014, Dr. James Darden, M.D., another state agency physician, completed a physical residual functional capacity assessment of Ward in connection with the reconsideration of her claim. (R. at 109-11.) Dr. Darden opined that Ward could perform sedentary work that required standing and/or walking for a total of no more than two hours in an eight-hour workday and sitting for a total of no more than six hours in an eight-hour workday. (R. at 109.) He further opined that Ward was limited in her ability to push/pull with her right lower extremity; that she could never climb ladders, ropes or scaffolds; but that she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 109-10.) Dr. Darden opined that Ward should avoid

concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, odors, dusts, gases and poor ventilation and that she should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 109-10.)

Ward continued to see Dr. Sheppard from October 21, 2014, through November 9, 2015, for various complaints, including diabetes, spinal stenosis, lumbar disc disease and chronic back pain. (R. at 719-52, 759-61.) A physical examination on October 21, 2014, was normal, and Ward's mood was euthymic. (R. at 728.) On October 28, 2014, she complained of back pain and arthralgias, as well as stiffness localized to one or more joints. (R. at 726.) Physical examination again was normal, and Ward had a euthymic mood. (R. at 726-27.) Dr. Sheppard diagnosed, among other things, diabetes mellitus type II, spinal stenosis and obesity, and he provided counseling on weight loss and exercise. (R. at 727.) He ordered an MRI of the lumbar spine, and he prescribed Cymbalta, Lantus and Novolog. (R. at 727.)

Dr. Sheppard completed a physical assessment of Ward on October 30, 2014, finding that she could lift and carry items weighing up to 10 pounds both frequently and occasionally. (R. at 704-06.) He found that she could stand/walk for less than two hours without interruption,[9] she could sit for a total of less than two hours in an eight-hour workday and that she could sit for less than two hours without interruption. (R. at 704-05.) He found that she could occasionally balance, but never climb, stoop, kneel, crouch or crawl. (R. at 705.) Dr. Sheppard opined that Ward's abilities to reach and to push/pull were affected by her chronic back pain and lumbar disc disease. (R. at 705.) He found that she could not work around heights or moving machinery because she was on pain medication. (R. at 706.) Dr.

___

[9] Dr. Sheppard did not specify the total amount of time Ward could stand/walk in an eight-hour workday. (R. at 704.)

Sheppard opined that Ward would miss more than two days of work monthly. (R. at 706.)

A lumbar MRI, dated November 14, 2014, showed multilevel degenerative disc disease, including a mild degree of degenerative facet joint hypertrophy at the L2-L3 and L3-L4 levels of the spine. (R. at 788-89.) There also was partial loss of disc height and disc desiccation, adjacent Modic type marrow signal change within the end plates, as well as a mild degree of bilateral foraminal stenosis at the L3-L4 level. (R. at 788.) It was noted that, when compared to an MRI from June 23, 2013, this represented a progression of disease at the L3-L4 level. (R. at 788-89.)

On March 12, 2015, Ward complained of continued chronic back pain, noting that a recent MRI showed worsening disc disease. (R. at 723-24.) Physical examination was normal, except for tenderness of the lumbosacral spine to palpation. (R. at 723-24.) Ward's mood was described as euthymic. (R. at 724.) Dr. Sheppard diagnosed lumbar disc degeneration, type II diabetes mellitus and obesity, and he prescribed Atenolol and Norco. (R. at 724.) An April 8, 2015, a chest x-ray showed degenerative changes to the thoracic spine. (R. at 711.) On May 22, 2015, Ward complained of chronic back pain. (R. at 721-23.) She reported that surgery to place a spinal stimulator earlier in the month was canceled due to a urinary tract infection. (R. at 721.) She stated that she had been sleeping in a recliner for the previous six months to alleviate pressure on her back and that she had chronic numbness and tingling in her legs. (R. at 721.) Ward reported anxiety, depression and sleep disturbances, as well as motor and sensory disturbances. (R. at 722.) Physical examination revealed tenderness to palpation over the lumbosacral spine, but Ward had a euthymic mood. (R. at 722.) The remainder of the examination was normal. (R. at 722.) Dr. Sheppard diagnosed lumbar disc degeneration, type II diabetes mellitus and radiculopathy, and he prescribed Norco.

(R. at 722-23.) On July 16, 2015, Ward continued to complain of chronic back pain which limited her activities. (R. at 720-21.) She reported that her surgery to place the spinal implant had not been rescheduled. (R. at 720.) Physical examination revealed lumbosacral spine tenderness to palpation, as well as a euthymic mood. (R. at 721.) The remainder of the examination was normal. (R. at 720-21.) Dr. Sheppard diagnosed type II diabetes mellitus, lumbar disc degeneration and obesity. (R. at 721.)

Dr. Sheppard completed a physical assessment of Ward on October 27, 2015, finding that she could both frequently and occasionally lift and carry items weighing up to 10 pounds. (R. at 754-56.) He found that she could stand/walk for less than two hours without interruption and that she could sit for less than two hours without interruption.[10] (R. at 754-55.) Dr. Sheppard found that Ward could occasionally balance, but never climb, stoop, kneel, crouch or crawl. (R. at 755.) He found that her abilities to reach and to push/pull were affected by her chronic back pain and lumbar disc disease. (R. at 755.) Dr. Sheppard found that Ward's ability to work around heights and moving machinery also were affected by her use of pain medication. (R. at 756.) He opined that Ward would be absent from work more than two days monthly. (R. at 756.) Dr. Sheppard based his findings on Ward's diagnoses of chronic back pain and lumbar disc disease. (R. at 754-56.)

Ward returned to Dr. Sheppard on November 9, 2015, for a follow-up appointment. (R. at 759-61.) She continued to have chronic back pain and still was contemplating a spinal stimulator. (R. at 759.) On physical examination, she was alert, oriented and in no acute distress with a euthymic mood. (R. at 760.) Her weight was recorded as 408 pounds. (R. at 760.) The remainder of Ward's physical

---

[10] Dr. Sheppard did not specify the total amount of time that Ward could stand/walk or sit in an eight-hour workday. (R. at 754-55.)

examination was normal. (R. at 760.) Dr. Sheppard diagnosed type II diabetes mellitus without complication and lumbar disc degeneration. (R. at 760.) On February 8, 2016, Ward's physical examination again was normal, and her mood was euthymic. (R. at 758-59.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Ward on February 17, 2016, at the request of her counsel. (R. at 803-11.) Lanthorn noted that Ward arrived promptly for her appointment and that she had a valid driver's license. (R. at 804.) The Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), was administered, on which Ward received a full-scale IQ score of 94, placing her in the average range of intellectual functioning. (R. at 803-04, 808.) She was fully oriented. (R. at 804.) Ward reported assisting with getting her children off to school, performing "light housekeeping," going to the grocery store with a family member, attending church with family, watching television and reading, and she stated that she enjoyed playing cards. (R. at 806.)

Ward's speech was clear and intelligible, and grooming and hygiene were adequate. (R. at 806.) She reported first becoming seriously depressed following the death of her father 14 years earlier, and she rated her current level of depression, with medication, at a five on a 10-point scale. (R. at 806.) Ward stated she had almost no energy. (R. at 806.) She denied suicidal ideation, plan or intent and had made no attempts of either. (R. at 807.) She reported no crying episodes, but endorsed feeling worthless and useless. (R. at 807.) Ward indicated worsening memory and concentration. (R. at 807.) She reported often feeling nervous, jittery, overwhelmed, worried and guilty about not contributing financially to her family, as well as shaking inside. (R. at 807.) Ward reported an average, chronic daily pain level of seven on a 10-point scale, noting significant leg and lower back pain due

to permanent nerve damage. (R. at 807.) She also noted neuropathy that had been present for three or four years. (R. at 807.)

After 10 minutes, Ward could recall four of five words, and she correctly performed Serial 7s. (R. at 807.) She gave higher order and correct interpretations to all three commonly used adages presented to her, and she correctly spelled the word "world" both forwards and backwards. (R. at 807.) Lanthorn administered the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), which indicated moderate to severe levels of emotional distress, as well as difficulty with concentration and memory. (R. at 808-09.) Test results indicated Ward had a great deal of difficulty handling stress, and she was experiencing a moderate level of depression and unhappiness, as well as anxiety. (R. at 809.) Lanthorn diagnosed Ward with major depressive disorder, recurrent, moderate; and generalized anxiety disorder; and he deemed her prognosis as being between fair and guarded. (R. at 810.) He opined that she should consider seeking psychotherapeutic intervention and collateral psychiatric intervention. (R. at 810.)

Lanthorn also completed a mental assessment of Ward, dated March 24, 2016, in which he opined that she had no limitations on her ability to understand, remember and carry out simple job instructions; mild limitations on her ability to follow work rules and to understand, remember and carry out detailed job instructions; moderate limitations on her ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, and to understand, remember and carry out complex job instructions; and marked limitations on her ability to deal with work stresses, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 813-15.) He opined that Ward would miss more than

two workdays monthly. (R. at 815.) Lanthorn stated that he was basing these limitations on Ward's diagnoses as contained in his report. (R. at 813-15.)

Ward continued to treat with Dr. Sheppard from March 24, 2016, through June 21, 2016, for complaints of chronic back pain. (R. at 826-29.) In March 2016, she reported that the epidural steroid injections she had been receiving were not helping, and she requested a second opinion from a different neurosurgeon. (R. at 827.) Ward exhibited tenderness to palpation of the lumbosacral spine and pain with motion, but she was alert and oriented and in no acute distress, and she had a euthymic mood. (R. at 828.) Dr. Sheppard made no changes to Ward's diagnoses, and he encouraged her to diet, exercise and lose weight. (R. at 828-29.) He referred her to Dr. Pryputniewicz. (R. at 829.)

On May 18, 2016, Ward saw Dr. David Pryputniewicz, M.D., at Blue Ridge Neuroscience Center, P.C., for a second opinion regarding her complaints of right lower extremity pain, right hip pain, lumbar pain and infrequent and less severe left lower extremity pain. (R. at 821-24.) She rated her pain as a six on a 10-point scale. (R. at 822.) She stated that her back pain was worsened by walking long distances, and she reported some increase in right leg pain when walking greater than 15 to 20 minutes. (R. at 821.) Ward reported that a dorsal column stimulator had been recommended to her. (R. at 821.) She also reported right lower extremity numbness and anxiety and depression. (R. at 822.) On examination, Ward was alert and oriented and in no acute distress. (R. at 822-23.) She had a waddling gait, and she exhibited tenderness of the right and left SI joints and of the lumbar spine. (R. at 822.) Fabere testing,[11] Fortin finger test[12] and thigh thrust[13] all were positive on

---

[11] Fabere testing is also known as Patrick's test. *See* Dorland's at 1688.

[12] Fortin finger test is used as an indicator of low back pain and SI joint dysfunction. *See* https://www.ncbi.nlm.nih.gov/pubmed/9247654 (last visited Aug. 22, 2019).

the right. (R. at 822.) Ward had normal muscle strength and tone, and there was no atrophy in any of the extremities. (R. at 822.) Finger-to-nose testing and rapid alternating hand movements were performed without difficulty. (R. at 823.) Ward's sensation was intact to light touch and pinprick in all extremities. (R. at 823.) Deep tendon reflexes were symmetric throughout. (R. at 823.) There was no clonus, and Hoffman's sign[14] was negative. (R. at 823.) On mental status examination, Ward was fully oriented, and her mood and affect were appropriate for her age and the situation. (R. at 823.)

A review of the November 14, 2014, lumbar MRI showed facet arthropathy at the L1-L2, L2-L3 and L3-L4 levels, creating some minor central canal stenosis at these levels. (R. at 823.) Dr. Pryputniewicz diagnosed Ward with intervertebral disc degeneration of the lumbar region; sacroiliitis, not elsewhere classified; low back pain; and pain in the right leg, element of incomplete radiculopathy, versus referred SI joint pain. (R. at 823.) He recommended a referral for a course of physical therapy to address the lumbar pain and SI joint dysfunction. (R. at 823.) Dr. Pryputniewicz also noted that weight loss would greatly benefit Ward and help reduce back pain, and it would better control her blood pressure and diabetes. (R. at 823.) He recommended a referral to Dr. Andrew Kramer to discuss bariatric surgery. (R. at 823.) Ward stated she would like to try physical therapy and the referral to Dr. Kramer. (R. at 823.) Dr. Pryputniewicz deferred the bariatric referral to Ward's primary care provider. (R. at 823.) He scheduled a follow up in six to

---

[13] Thigh thrust test, also known as posterior pelvic pain provocation test, is used to test for SI joint dysfunction. *See* https://www.physio-pedia.com/Posterior_Pelvic_Pain_Provocation_Test (last visited Aug. 22, 2019).

[14] Hoffman's sign or Hoffman's reflex is a test used to examine the reflexes of the upper extremities and tests for the possible existence of spinal cord compression from a lesion on the spinal cord or another underlying nerve condition. *See* https://www.medicalnews today.com/articles/322106.php (last visited Aug. 22, 2019).

eight weeks to evaluate the effectiveness of the physical therapy. (R. at 823.) He noted that, if Ward's pain persisted despite conservative treatment, he would consider ordering updated studies to evaluate for nerve compression. (R. at 823.) However, with a BMI of 68.75, he noted that Ward would be at higher risk for surgical complications if any surgical intervention were considered. (R. at 823.)

When Ward returned to Dr. Sheppard in June 2016, she reported that Dr. Pryputniewicz had recommended a referral for bariatric surgery. (R. at 826.) At that time, she was alert, oriented and in no acute distress, and she had a euthymic mood. (R. at 826-27.) Her weight was 414 pounds. (R. at 826.) Dr. Sheppard made no changes to Ward's diagnoses. (R. at 827.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & 2019 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Ward argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) More specifically, Ward argues that the ALJ erred in her weighing of the medical evidence in arriving at her disability decision. (Plaintiff's Brief at 5-6.)

The ALJ found, generally, that Ward retained the functional capacity to perform a limited range of simple and repetitive, unskilled sedentary work that required no more than occasional interaction with the general public. (R. at 25-26.) For the reasons that follow, I find that substantial evidence supports the ALJ's weighing of the medical evidence and her resulting residual functional capacity finding.

I first will address Ward's physical residual functional capacity. The ALJ found that Ward could perform work that did not require her to lift and/or carry items weighing more than 20 pounds occasionally and more than 10 pounds frequently; that did not require more than two hours of standing/walking in an eight-hour workday, more than six hours of sitting in an eight-hour workday, more than occasional pushing/pulling with the lower extremities, more than occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching, that did not require her to work around hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds, working on vibrating surfaces or crawling, that did not require even moderate exposure to temperature extremes, excess humidity and pulmonary irritants and that did not require driving. (R. at 25.)

In arriving at this conclusion, the ALJ gave "some weight" to the opinions of Ward's treating physician, Dr. Sheppard, as they were not supported by the objective medical evidence, including his own treatment notes. (R. at 29.) Dr. Sheppard opined in October 2014, that Ward could lift and carry items weighing up to 10 pounds both frequently and occasionally; she could stand/walk for less than two hours without interruption; she could sit for less than two hours without interruption and in total in an eight-hour workday; she could occasionally balance, but never climb, stoop, kneel, crouch or crawl; her ability to reach and to push/pull were affected by her chronic back pain and lumbar disc disease; she could not work around heights or moving machinery due to pain medication usage; and she would miss more than two days of work monthly. (R. at 704-06.) Dr. Sheppard completed another physical assessment of Ward in October 2015. (R. at 754-56.) In this assessment, Dr. Sheppard made the same findings as previously, except he made no finding with regard to Ward's ability to sit over the course of an eight-hour workday. (R. at 754-56.)

As noted by the ALJ in her decision, Dr. Sheppard treated Ward throughout the time period relevant to Ward's claim. However, neither Dr. Sheppard's treatment notes nor the other medical evidence of record supports the "extreme limitations" he imposed on Ward. (R. at 29.) The ALJ gave "some weight" to Dr. Sheppard's opinions, insofar as he opined that Ward could perform sedentary work. (R. at 29.) Otherwise, the ALJ stated that she was giving significant weight to the opinions of the state agency physicians, who found that Ward could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; stand and walk for a total of three hours[15] and sit for a total of about six hours in an eight-hour workday; that she was limited in her ability to push and/or pull with her lower extremities; that she could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; that she should avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, fumes, odors, dusts, gases and poor ventilation; and that she should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 98-99, 109-10.) The ALJ found that these opinions were consistent with the medical evidence of record as a whole with respect to Ward's sedentary residual functional capacity. (R. at 29.)

I find that substantial evidence supports the ALJ's weighing of the medical evidence and resulting physical residual functional capacity finding. For instance, as the ALJ stated, Dr. Sheppard's more extreme limitations are not supported by his own treatment notes. These limitations included that Ward could lift and/or carry only up to 10 pounds, both occasionally and frequently; that she could stand/walk less than two hours without interruption; that she could sit less than two

---

[15] State agency physician, Dr. Darden, opined that Ward could stand and/or walk for a total of no more than two hours in an eight-hour workday. In all other regards, the state agency physicians' opinions were identical.

hours without interruption;[16] that she had some manipulative, postural and environmental limitations; and that she would miss more than two days of work monthly. (R. at 704-06, 754-56.) However, Dr. Sheppard's treatment notes reflect that Ward's physical examinations were largely unremarkable, with the exception of some tenderness to palpation of the lumbosacral spine, some lumbosacral spasms and some pain with motion. Dr. Sheppard consistently noted that Ward was in no acute distress and that she had normal cardiopulmonary and neurological findings. Over the course of his treatment of Ward, Dr. Sheppard referred her for a course of physical therapy. However, she completed only four of 18 scheduled appointments before being discharged for lack of compliance. Dr. Sheppard also treated Ward conservatively with pain medications, including Lortab, Flexeril and Norco, and he counseled her on multiple occasions about exercising, modifying her diet and losing weight to improve her back pain.

As for the other medical evidence of record, I find that it also does not support Dr. Sheppard's more extreme limitations of Ward. For instance, physical examinations all yielded largely normal results. In July 2013, a physician assistant at East Tennessee Brain & Spine Center noted that Ward had some tenderness over the axial spine, some ankle edema, and range of motion was somewhat limited in terms of flexion and extension due to pain, but she had good strength in both legs, and there was no focal weakness. Dorsiflexion and plantar flexion were full, bilaterally, and straight leg raising test was negative, as was Patrick's maneuver. Sensation and reflexes were normal, and Ward had a nonantalgic gait. In August 2013, Dr. Shields, a neurosurgeon, noted a normal range of motion of the neck and spine without tenderness, Ward's peripheral pulses were equal and symmetric, and her extremities were normal with no edema. She had normal and equal muscle

---

[16] In the October 2014 assessment, Dr. Sheppard specified that Ward could sit for less than two hours without interruption, as well as in total in an eight-hour workday. (R. at 705.)

strength, bulk and tone in all extremities, and sensation was normal throughout. That same month, Dr. Labatia noted that Ward had exquisite tenderness over the right greater trochanter. In October 2013, she had minimal tenderness over the axial spine and tenderness to deep palpation over the right greater trochanter, but straight leg raising was negative, motor strength was full, and she had a nonantalgic gait. Dr. Labatia advised Ward to lose weight by staying active and modifying her diet. In March 2014, another physical examination at East Tennessee Brain & Spine Center showed full strength, normal reflexes and a normal neurological examination. In August 2014, psychologist Nies noted that Ward had normal motor activity, and she did not demonstrate pain behavior. A physical examination in May 2016 by Dr. Pryputniewicz showed a waddling gait, due to body habitus, some tenderness of the SI joints, bilaterally, and tenderness of the lumbar spine. Testing for hip arthritis and SI joint dysfunction was positive on the right. However, Ward had normal muscle strength and tone, no atrophy in any of the extremities, normal sensation throughout, symmetric deep tendon reflexes, no clonus and negative testing for spinal cord compression. Dr. Pryputniewicz recommended conservative treatment with a course of physical therapy, and he advised Ward that weight loss would help reduce her back pain.

Additionally, Dr. Sheppard's limitations are not supported by the objective evidence contained in the record, which shows mostly mild degenerative changes. May 17, 2013, x-rays of the lumbar spine showed mild degenerative changes at multiple lower thoracic levels. In July 2013, Steve McLaughlin, a physician assistant at East Tennessee Brain & Spine Center, stated that the MRI showed facet arthropathy at the L1-L2, L2-L3 and L3-L4 levels of the spine, as well as some "very, very mild" central stenosis, but no disc herniation or severe central stenosis was noted, and there was no structural lesion to explain Ward's right lower extremity pain. A November 14, 2014, lumbar MRI again showed multilevel

degenerative disc disease, including a mild degree of degenerative facet joint hypertrophy at the L2-L3 and L3-L4 levels of the spine. There was partial loss of disc height and disc desiccation, adjacent Modic type marrow signal change within the end plates,[17] as well as a mild degree of bilateral foraminal stenosis at the L3-L4 level. A progression of disease at the L3-L4 level from a prior MRI was noted. An April 8, 2015, chest x-ray showed degenerative changes to the thoracic spine.

Lastly, Dr. Sheppard's limitations are not supported by Ward's activities of daily living, as found by the ALJ. In August 2014, she advised psychologist Nies that she got her children off to school and prepared meals with frequent rest breaks. She also reported enjoying reading, watching television and playing computer games. Ward stated that she could manage her medications independently. In February 2016, she advised psychologist Lanthorn that she could get her children off to school, perform "light housekeeping," go grocery shopping with a family member, attend church with family, watch television, read and play cards. At her hearing, Ward testified that she could grocery shop with assistance while using a ride along cart, she drove about twice weekly, and she could prepare simple meals.

For all of the above-stated reasons, I find that the ALJ's weighing of the evidence and resulting physical residual functional capacity finding are supported by substantial evidence. For the reasons that follow, I also find that the ALJ's mental residual functional capacity finding is so supported.

With regard to Ward's mental restrictions, the ALJ found that Ward could perform a limited range of simple, unskilled sedentary work that required no more than occasional interaction with the general public. Ward argues that the ALJ erred

---

[17] Modic changes are bone marrow lesions within a vertebral body on MRI, suggestive of association with low back pain. *See* https://www.physio-pedia.com/Modic_changes (last visited Aug. 22, 2019).

in arriving at this finding because she should have given more weight to the opinion of Lanthorn, as opposed to the state agency psychologist. For the reasons that follow, I am not persuaded by Ward's argument. In her decision, the ALJ stated that she was giving "little weight" to psychologist Lanthorn's opinion and "significant weight" to the opinion of state agency psychologist Leizer.[18]

In March 2016, Lanthorn opined that Ward had moderate limitations in her ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. He found she had marked limitations in her ability to deal with work stresses; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. Lanthorn opined that Ward would miss more than two workdays monthly. Conversely, in January 2014, psychologist Leizer opined that Ward had no limitations in performing activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and had experienced no episodes of decompensation of extended duration. Leizer further noted that Ward could independently perform many activities of daily living, management of her hygiene, medications and funds. He concluded that Ward had a nonsevere mental impairment.

I find that substantial evidence supports the ALJ's weighing of the evidence in arriving at her mental residual functional capacity finding. Specifically, I find that Lanthorn's opinion is not supported by his own report or the other medical evidence of record, while the opinion of state agency psychologist Leizer is. First,

---

[18] The ALJ stated that she found Ward to be more restricted than as found by state agency psychologist Dougherty, who found that Ward did not have any medically determinable mental impairment at all.

Lanthorn stated in his report that Ward's grooming and hygiene were adequate. However, in his mental assessment, he opined that she was moderately limited in her ability to maintain personal appearance. Likewise, in his report, Lanthorn noted that Ward arrived on time for her appointment and that she had a driver's license, but in his assessment, he opined that she was markedly limited in her ability to demonstrate reliability. He further found that Ward was moderately limited in her ability to maintain attention and concentration, but his report reflects that Ward was able to recall four of five words after 10 minutes, she correctly performed Serial 7's, and she correctly spelled the word "world" both forwards and backwards. Ward also rated her depression, with medication, as a five on a 10-point scale.

While the record shows that Ward was taking Cymbalta, prescribed by her treating physician, Dr. Sheppard, during the time period relevant to her claim, she testified that she had never been psychiatrically hospitalized and had never undergone any mental health counseling. A review of Dr. Sheppard's treatment notes of Ward, spanning more than three years, reveals that she consistently was alert and oriented with a euthymic mood. Dr. Sheppard never noted any restrictions due to Ward's mental impairments. While his treatment notes do reveal that he prescribed Cymbalta for Ward, they contain no mental health diagnosis during the relevant time period. Moreover, in October 2013, Ward specifically denied anxiety and depression. The only mental health complaints noted in Dr. Sheppard's treatment notes were in May 2015, when Ward reported anxiety, depression and sleep disturbance. Nonetheless, Dr. Sheppard continued to find that she was alert and oriented with a euthymic mood.

I further find that the other medical evidence of record does not support the restrictions contained in Lanthorn's mental assessment of Ward. For instance,

when Ward saw Dr. Shields in August 2013, she reported depression, irritability and memory loss. Nonetheless, Dr. Shields found that Ward's recent and remote memory, attention span and concentration were intact. In August 2014, Ward advised psychologist Nies that her mood was "pretty normal" and "upbeat," but that she was "snappish" at times. She also acknowledged intermittent sadness, sleep disturbance, feelings of worthlessness and guilt and irritability, but noted that she had experienced only one episode of depression. Nies noted that Ward did not appear to have difficulty understanding or retaining directions, and repetition was not required. Ward had an appropriate affect with a neutral mood, and she was pleasant and cooperative throughout the evaluation. Nies diagnosed Ward with an adjustment disorder with mixed anxiety and depressed mood. At one point in the report, Nies noted that it did not appear that Ward was experiencing psychiatric distress, while in another, she reported that Ward likely was experiencing some degree of psychiatric distress. In May 2016, despite Ward's complaints of anxiety and depression, Dr. Pryputniewicz found that Ward was fully oriented, and her mood and affect were appropriate for her age and the situation.

Lastly, I find that Ward's reported activities of daily living do not support the existence of a disabling mental impairment. These included weekly grocery shopping with some assistance and the use of a ride on cart, driving independently, preparing quick meals, feeding her cats, independently managing her medications, performing light housework with some assistance, doing laundry, washing dishes while sitting, attending church services with family, getting her children off to school, taking care of her finances with her husband's assistance, talking with family on the telephone two to three times weekly, visiting family, watching television, reading, playing cards and playing computer games. She also noted in a November 2013 Function Report that she followed both spoken and written

instructions "fairly well" and that she usually got along "fairly well" with authority figures.

Based on the above-stated reasons, I find that the ALJ's weighing of the mental opinion evidence and her resulting mental residual functional capacity finding is supported by substantial evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence of record;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Ward's physical residual functional capacity;

3. Substantial evidence exists in the record to support the ALJ's finding with regard to Ward's mental residual functional capacity; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Ward was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Ward's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     August 22, 2019.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE